**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| IRVING FIREMEN'S RELIEF & RETIREMENT FUND,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>UBER TECHNOLOGIES, INC.; TRAVIS KALANICK,<br>*Defendants-Appellees*,<br><br>——————<br><br>MORGAN STANLEY INVESTMENT MANAGEMENT INC.; NEW RIDERS LP,<br>*Intervenors.* | No. 19-16667<br><br>D.C. No.<br>4:17-cv-05558-HSG<br><br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted December 7, 2020
Pasadena, California

Filed May 19, 2021

Before:  Paul J. Kelly, Jr.,[*] Ronald M. Gould, and
Ryan D. Nelson, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[**]

### Securities Fraud

The panel affirmed the district court's dismissal for failure to state a claim in a putative class action brought by Irving Firemen's Relief & Retirement Fund ("Irving") against Uber Technologies, Inc. and Travis Kalanick, cofounder and former CEO of Uber, alleging a claim of securities fraud under California Corporations Code sections 25400(d) and 25500.

The district court assumed that the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act applied to this case.

The panel held that Rule 9(b)'s particularity requirement applied to state law causes of action relating to fraud when asserted in federal court. To establish a securities fraud violation under the federal Securities Exchange Act, a plaintiff has the burden to prove that the defendant's act or omission caused plaintiff's loss.

---

[*] The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's holding that Irving did not adequately allege loss causation.

Specifically, the panel rejected Irving's contention that the district court erred by applying the federal standard for loss causation rather than the "less-rigid" state law standard. The panel held that California law, as cited by the parties, provided only limited guidance on how its causation element should be applied in this case. The panel held further that the district court did not err in looking to federal cases interpreting loss causation for claims brought under section 10(b) of the Securities Exchange Act.

Looking to the federal loss causation regime as persuasive authority, the panel held that Irving did not adequately allege loss causation. Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined. The panel held that this "fraud-on-the-market-theory" conflicted with Irving's assertion that mere inflation was enough. Even assuming without deciding that Uber and Kalanick made actionable misstatements, and news articles and government investigations revealed the truth to the market, the panel held that the claims still failed because Irving did not adequately and with particularity allege that those revelations *caused* the resulting drop in Uber's valuation.

Because Irving did not plausibly allege that Uber and Kalanick's alleged misstatements caused its damages, the panel did not reach the other elements of Irving's claim or the other arguments advanced by the parties.

**COUNSEL**

Joseph D. Daley (argued) and Luke O. Brooks, Robbins Geller Rudman & Dowd LLP, San Diego, California; Dennis J. Herman, Robbins Geller Rudman & Dowd LLP, San Francisco, California; for Plaintiff-Appellant.

A. Matthew Ashley (argued), Andra Greene, and Michael D. Harbour, Irell & Manella LLP, Newport Beach, California, for Defendant-Appellee Uber Technologies, Inc.

Sarah M. Harris (argued), Joseph G. Petrosinelli, Eden Schiffmann, Harrison L. Marino, and Kimberly Broecker, Williams & Connolly LLP, Washington, D.C.; Walter F. Brown and James N. Kramer, Orrick Herrington & Sutcliffe LLP, San Francisco, California; for Defendant-Appellee Travis Kalanick.

**OPINION**

GOULD, Circuit Judge:

This case concerns allegations of securities fraud against Uber Technologies, Inc. ("Uber" or the "Company"), a technology startup known for its ridesharing application, and Travis Kalanick ("Kalanick"), cofounder and former CEO of Uber. After Uber's founding in 2009, its valuation soared, with some investors assigning a valuation as high as $68 billion by mid-2016. Between June 2014 and May 2016, Kalanick and Uber completed four preferred stock offerings, raising more than $10 billion in additional capital through limited partnerships and other entities. Irving Firemen's Relief & Retirement Fund ("Irving"), a retirement fund for firefighters based in Irving, Texas, acquired Uber securities through one of these offerings on February 16,

2016.  Throughout 2017, several alleged corporate scandals surfaced, and by early 2018, investors estimated a nearly 30% decline in Uber's valuation.

Irving filed a putative class action against Uber and Kalanick alleging one claim of securities fraud under California Corporations Code sections 25400(d) and 25500. The district court dismissed the operative complaint for failure to state a claim.  We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.  We hold that Irving did not state a claim because it did not adequately allege that Uber and Kalanick's alleged fraudulent misstatements and omissions caused its alleged losses.

# I

At the time Irving filed the Second Amended Complaint ("SAC")—the operative complaint in this appeal—in 2018, Uber had raised more than $11.5 billion in financing through a series of private equity and debt offerings to investors.  In 2009, Uber was valued at $4 million and sold its first $200,000 in securities.  The next year, it raised $1.3 million. And in the year after that, Uber's value increased to $350 million after it raised $48 million through its Series A and B funding rounds.  In 2013, after raising an additional $363 million through its Series C funding round, Uber was worth more than $3.5 billion.  By June 2014, Uber was valued at more than $18 billion.

Between no later than June 2014[1] and May 24, 2016, Uber offered and sold Series D, E, F, and G securities ("Offerings"), the offerings at issue in this appeal.  These

---

[1] The SAC provides no announcing date starting the Series D offering but alleges that the offering ended on June 6, 2014.

private offerings were sold through limited partnerships and other entities formed to sell and hold securities issued in the Offerings. Irving acquired its interests in Uber securities by becoming a limited partner of New Riders LP ("New Riders"), a Delaware limited partnership, on February 16, 2016; New Riders then in turn invested in Uber's Series G Preferred Stock. The Offerings netted more than $10 billion. By mid-2016, investors valued Uber at as much as $68 billion, higher than any other private technology startup at the time.

Throughout 2017, a series of alleged corporate scandals surfaced. We set forth a brief overview of these scandals in chronological order. In February 2017, former Uber engineer Susan Fowler posted a blog describing her experiences of alleged sexual harassment while working for Uber. That same month, Google affiliate Waymo sued Uber for theft of its trade secrets related to self-driving car technology. The next month, *The New York Times* reported on "Greyball," a secret Uber program under which Uber had collected data through the Uber app and other sources to identify and circumvent officials in jurisdictions that prohibited or restricted Uber's operations.

On April 12, 2017, a news article exposed a secret Uber program dubbed "Hell," which was in use between 2014 and 2016. In cities where Uber competed with Lyft—another ridesharing service—Uber collected information on Lyft drivers through spoofed[2] accounts. This information allowed Uber to track Lyft's prices and the number of drivers at each location in real time and identify which drivers were

---

[2] Uber allegedly created fake Lyft rider accounts and used commonly available software to fool Lyft's system into thinking those riders were in particular locations.

driving for both Uber and Lyft.  On April 25, 2017, *Reuters* reported that a South Korean court had determined that Uber had violated South Korea's national transport law. Sometime in the third quarter of 2017, the U.S. Department of Justice began a criminal probe into Uber's foreign practices.  In September 2019, *Bloomberg* reported "widespread" Asia bribery allegations against Uber.  And on November 22, 2017, reports surfaced of a data breach that occurred in October 2016 and affected 57 million riders and drivers.

As an apparent result of these cascading scandals, from fall 2016 to February 28, 2018, several funds holding stakes in Uber wrote down the value of their Uber holdings, which were not yet being publicly traded.  For instance, BlackRock, a mutual fund investor, wrote down its investment by 33.3%. Similarly, Fidelity devalued its investment by 28%; Hartford Funds by 28%; and T. Rowe Price by 29.3%.  In April 2017, media outlets reported that Uber had lost $10 billion in value since the beginning of 2017.  Kalanick resigned as Uber's CEO in June 2017.  In August 2017, investors such as Vanguard Group, Principal Funds, Hartford Funds, and T. Rowe Price marked down their Uber investments by as much as 15%, or $10.2 billion.  In September 2017, news reports indicated that SoftBank valued the Company at $50 billion, representing at least $18 billion in lost value.  In October 2017, BlackRock marked down its Uber investment by 16%.

On November 27, 2017, a consortium of investors led by SoftBank made an $8 billion offer to purchase a stake in Uber from its existing shareholders.  The amount of this offer implied a $48 billion overall valuation of Uber, which was a 30% reduction from its apparent estimated peak in mid-2016.  Around the same time as the SoftBank tender offer, Uber reported a 40% increase in its quarterly losses. The SoftBank sale was completed in January 2018.

Kalanick sold nearly a third of his 10% stake in Uber pursuant to that transaction.  After the tender offer, Fidelity Investments marked down its Uber investment by 21%.  In December 2017, Vanguard Group also marked down its Uber investment by another 15.3%. By early 2018, investors estimated a nearly 30% decline in Uber's valuation.

Irving filed this putative class action lawsuit against Uber and Kalanick soon after.  It asserted one violation of securities fraud under California Corporations Code sections 25400(d) and 25500.  The SAC alleges that Uber and Kalanick made false and misleading statements and omissions about Uber and its operations to induce the purchase of billions of dollars of Uber securities.  These statements and omissions were allegedly disseminated "through information in the offering memoranda . . . [and] by making numerous public statements."  Uber and Kalanick allegedly misled investors by concealing material risks to their business, including illegal business practices, which allegedly allowed them to market and sell Uber securities at inflated prices.  The SAC asserts that when these business practices came to light, Uber's valuation declined, reducing the value of Irving's—and other class members'—securities and their actual and anticipated investment returns by billions of dollars.

The SAC divides Uber's alleged misrepresentations into six categories, five of which correspond directly to each of the 2017 corporate scandals: (1) government regulation and "Greyball," (2) data security, (3) competition and the "Hell" program, (4) self-driving cars and trade secrets litigation, and (5) corporate culture and sexual harassment allegations. The sixth category concerns misrepresentations about the general risks to Uber's business from negative publicity and other events that threatened to curtail its rapid growth.

The district court dismissed the SAC without granting leave to amend.  The district court assumed that the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA")[3]  applied to the case.  The district court applied cases interpreting section 10(b) of the Securities Exchange Act of 1934 ("Securities Exchange Act"), 15 U.S.C. § 78j(b), noting that the parties had relied on such cases.  The district court then concluded that Irving did not adequately allege false or misleading representations or loss causation.  This appeal followed.

## II

We review *de novo* a district court's dismissal pursuant to Rule 12(b)(6).  *In re Quality Sys. Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017).  We accept well-pleaded allegations as true and construe them in the light most favorable to the plaintiff.  *In re Gilead Scis. Sec. Litig.*,

---

[3] Although the district court found that neither party contested the application of the PSLRA pleading standard, Irving contends that it raised this issue in a motion before the district court in a footnote. Regardless of whether Irving properly preserved the issue, however, we may address it because the applicability of federal pleading standards to state law claims is a purely legal question.  *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 912 (9th Cir. 1995).  The district court made no mention of the PSLRA in its loss causation analysis and concluded that Irving's "broad brush pleading is insufficient under Rule 9(b)."  We conclude that the district court applied only the heightened pleading standards of Rule 9(b) in its loss causation analysis.  *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).  Because we hold that Irving fails to state a claim under the pleading requirements of Rule 8(a) and Rule 9(b), we need not and do not address whether the heightened pleading standards of the PSLRA apply to a claim of violation of California Corporations Code sections 25400 and 25500 when asserted in federal court.

536 F.3d 1049, 1055 (9th Cir. 2008). A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This is not a mere technical requirement. Instead, it reflects hundreds of years of development of the common law, which was adopted in our federal rules of civil procedure. 5A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 1296 (4th ed.). Because allegations of fraud inescapably carry a degree of moral turpitude, Rule 9(b) imparts a heightened note of seriousness, requiring a greater degree of pre-discovery investigation by the plaintiff, followed by the plaintiff's required particular allegations, thereby protecting a defendant's reputation from frivolous and unfounded allegations and permitting a particularized basis for a defendant to respond to the particularized allegations. *Id.* at n.4, 5, 11 (citing *Am. C.L. Union v. Holder*, 673 F.3d 245, 253 (4th Cir. 2011); *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009)).

It is established law that Rule 9(b)'s particularity requirement applies to state law causes of action relating to fraud when asserted in federal court. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). Furthermore, "Rule 9(b) applies to all elements of a

securities fraud action, including loss causation." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). To satisfy Rule 9(b), the allegations must contain "sufficient detail" to (1) give the defendant "ample notice of [the plaintiff's] loss causation theory" and (2) provide the court "some assurance that the theory has a basis in fact." *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1056 (quoting *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 989–90 (9th Cir. 2008)). The second requirement in particular serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018) (cleaned up).

## III

To establish a securities fraud violation under the Securities Exchange Act, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). On appeal, Irving describes its loss causation theory as follows: Uber and Kalanick's false or misleading statements and omissions concealed existing risks to Uber's business and growth which, if known at the time, would have negatively impacted the valuation of the securities sold in Uber's Offerings, and thus caused those shares to be overvalued—or inflated— when they were purchased by Irving and the class. If an accurate rendition describing Uber's business had been known, class members would have reduced their valuation of Uber's preferred stock to reflect expected: (1) reduced cash flows, (2) higher risks, and (3) IPO timing delays—and

consequently would have paid far less than they did. When the true state of Uber's business was revealed, Uber's actual value at the time of the Offerings was revealed to have been significantly less than investors had believed.

The SAC asserts that, "[v]aluation experts and market observers" attributed Uber's reduction in value to "revelations of truth regarding the true state of Uber's business." Dr. Aswath Damodaran, finance professor at New York University's Stern School of Business, concluded that Uber's value declined because of "Uber's Extracurricular Activities." Dr. Damodaran attributed this to an increase in Uber's expected risk, which the SAC asserts resulted in a decreased valuation, to emerging "news stories."

Uber contends, however, that Irving did not satisfy the element of loss causation. We agree, and we affirm the district court's holding that Irving did not adequately allege loss causation.

## A

Irving contends that the district court erred by applying the federal standard for loss causation rather than the "less-rigid state law standard." Under Irving's interpretation, it need only show that the proposed class members purchased securities that were overvalued—or inflated—at the time of the offerings. By Irving's account, class members' damages arose at the moment they purchased overinflated securities, and no subsequent corrective disclosures or public price declines were needed. We disagree.

Although Irving brings claims under state law, California Corporations Code sections 25400 and 25500 are derived from substantially identical language in the

Securities Exchange Act.  *See Kamen v. Lindly*, 94 Cal. App. 4th 197, 202–03 (Ct. App. 2001).  In particular, "sections 25400 and 25500 are modeled on subsection (a) and subsection (e) of section 9 of the Securities Exchange Act . . . (15 U.S.C. § 78i(a) & (e))." *Id.*  But the district court did not err in looking to federal cases interpreting loss causation for claims brought under section 10(b) of the Securities Exchange Act.  The loss causation requirement applies to all claims arising under the Securities Exchange Act.  *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th Cir. 2013) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter *caused the loss* for which the plaintiff seeks to recover damages." (emphasis added in *Nuveen*) (quoting 15 U.S.C. § 78u-4(b)(4)).  Loss causation, then, is required for section 10(b) claims—the cases on which the district court relied—as well as section 9 claims—the section on which sections 25400 and 25500 were modeled.  *See Kamen*, 94 Cal. App. 4th at 202–03 (citing 15 U.S.C. § 78u-4(b)(4)).  Thus, federal law is "unusually strong persuasive precedent" in construing sections 25400 and 25500.  *Id.* at 203.  Indeed, "[i]n the absence of California cases that address the issue at bench, [California courts] look to federal cases." *Id.*

California law, as cited by the parties, provides only limited guidance on how its causation element should be applied in this case.  Section 25400(d) "makes it unlawful . . . for sellers or buyers of stock to make false or misleading statements of material facts for the purpose of inducing a purchase or sale." *Overstock.com, Inc. v. Goldman Sachs & Co.*, 231 Cal. App. 4th 513, 530 (Ct. App. 2014), *as modified* (Nov. 25, 2014) (citation omitted); *see also* Cal. Corp. Code § 25400.  Section 25500 creates a private remedy for violations of section 25400.  *Cal. Amplifier, Inc. v. RLI Ins.*

*Co.*, 94 Cal. App. 4th 102, 109 (Ct. App. 2001). Section 25500 requires a plaintiff to allege that it purchased or sold a security "at a price which was affected" by the violation. Cal. Corp. Code § 25500. And this "requires the violator's acts to cause the resultant damages." *Bowden v. Robinson*, 67 Cal. App. 3d 705, 714 (Ct. App. 1977).

Irving's cited case law in our view does not support its argument that mere inflation is enough to show loss causation under California law. Quoting *Mirkin v. Wasserman*, 858 P.2d 568, 580 (Cal. 1993), Irving contends that, under California law "[a]ll that is required is that the plaintiff *establish that the price which he paid . . . was affected by* the defendant's conduct or statements." The sentence that Irving relies upon, taken from the *Mirkin* decision, is not even a holding of that court. Instead, the California court there merely contrasted the plaintiffs' claim of common law deceit, which was before it, with a hypothetical claim under sections 25400 and 25500, claims that were not before it, and which hypothetical claims "conspicuously avoid[s] the requirement of actual reliance." *Id.* (cleaned up). Moreover, *Mirkin* noted the fraud-on-the-market doctrine applies equally to Rule 10b-5[4] and California securities law. *Id.* at 583. And as explained below, the fraud-on-the-market theory requires a revelation to "cause[] the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 789 (9th Cir. 2020).

Irving also points to *Diamond Multimedia Systems, Inc. v. Superior Court*, 968 P.2d 539, 543 (Cal. 1999), for crediting allegations that "[a]t the time of [plaintiffs']

---

[4] Rule 10b-5 was promulgated pursuant to section 10(b) of the Securities Exchange Act. *See* 17 C.F.R. § 240.10b-5.

purchases the fair market value of the shares was substantially less than the price paid by class members." But this, too, was dicta. There, the California Supreme Court expressly disclaimed any binding comment on the merits of the underlying lawsuit, *see id.* at 546, focusing exclusively on the discrete legal issue of whether a "civil remedy [under section 25500] is available to out-of-state purchasers," *id.* at 541. Even so, the complaint did not rely exclusively on price inflation at the time of the purchase, instead alleging a drop in stock prices following a revelation. *Id.* at 542. These cases do not establish that the state loss causation regime is less rigid than the federal loss causation regime or that mere inflation is enough under California law. *See also In re Nuveen Funds*, No. C 08-4575 SI, 2011 WL 1842819, at *5, *26 (N.D. Cal. May 16, 2011), *aff'd sub nom.* 730 F.3d 1111 (9th Cir. 2013) (equating loss causation under sections 25400 and 25500 with loss causation under Rule 10b-5).

Because the parties have not pointed to California law directly addressing this issue, we turn to the federal standard for loss causation. We nonetheless emphasize that, although federal precedent is unusually persuasive, California law still governs claims brought pursuant to sections 25400 and 25500. *See Smith v. Lenches*, 263 F.3d 972, 977–78 (9th Cir. 2001) (expressing that California law governs the determination whether California securities laws were violated).

**B**

Irving next contends that the district court misapplied federal law when it rejected Irving's loss causation theory. Looking to the federal loss causation regime as persuasive authority, we conclude that Irving did not adequately allege loss causation.

**1**

In the loss causation analysis, "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). A plaintiff must show that the defendant's misrepresentation was a "substantial cause" of his or her financial loss. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citation omitted), *as amended* (Sept. 11, 2014). To survive a motion to dismiss, a plaintiff "need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.*

Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined. *Nuveen*, 730 F.3d at 1119–20 (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)). Courts refer to this theory as "fraud-on-the-market." *Id.* at 1120. In this scenario, "the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d at 789 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). This theory notably conflicts with Irving's assertion that mere inflation is enough.

We stress the second element, which requires a showing that the revelation of the truth "caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." *Id.* at 791. This analysis

involves a temporal component. *Id.* at 790. "[A] disclosure followed by an immediate drop in stock price is more likely to have caused the decline." *Id.* For example, we have held that investors adequately alleged loss causation when they claimed that a company engaged in improper accounting practices because the "stock [price] fell precipitously after [the company] began to reveal figures showing the company's true financial condition." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1026 (9th Cir. 2005). However, we have rejected "a bright-line rule requiring an immediate market reaction because the market is subject to distortions that prevent the ideal of a free and open public market from occurring." *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1057–58 (cleaned up).

## 2

Even assuming without deciding (1) that Uber and Kalanick made actionable misstatements and (2) that the news articles, the Waymo lawsuit, and the government investigations cited by Irving revealed the truth to the market, still the claims fail because Irving did not adequately and with particularity allege that these revelations *caused* the resulting drop in Uber's valuation.

Irving's loss causation theory lumps together more than 60 alleged misstatements, which Irving associates with at least eight purported corporate scandals that took place throughout the course of a year, and Irving concludes that the disclosure of these scandals resulted in a year-long decline in Uber's valuation. But Irving's allegations fail to link Uber's reduced valuation to any particular scandal or misstatement. The news articles and expert assessments provided in the SAC attribute Uber's reduced valuation to corporate scandals generally, referring for example to a "string of blows dealt to [Uber's] brand this year." These

general allegations, which lump together the effects of various alleged scandals, do not contain sufficient detail to provide Uber and Kalanick with ample notice of Irving's loss causation theory or provide us with assurance that its theory is plausibly based in fact as required by Rule 9(b). *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1056; *see also Wellpoint*, 904 F.3d at 677 (explaining that, to satisfy Rule 9(b), plaintiffs must "differentiate their allegations" and cannot "lump" together dissimilar defendants); *Fener v. Operating Engineers Const. Indus. & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 410 (5th Cir. 2009) (rejecting at the summary judgment stage, expert report showing only that a "stock reacted to the entire bundle of negative information" (emphasis omitted)).

Irving provided a chart purporting to show how various funds responded to revelations between October 2016 and February 2018. At best, however, this chart does not support Irving's theory; at worst, the chart undermines it. As the district court pointed out:

> This chart . . . shows that every fund maintained or increased its valuation after the alleged revelations of "Susan Fowler Blog post," "Waymo sues Uber," and "News of Greyball Program breaks." . . . And the majority of funds maintained or increased their valuation after the alleged revelations of "News of Hell Program breaks," and "CEO Travis Kalanick Resigns." . . . [E]ven if the Court were to find that these fund valuations do not definitively contradict the claim that certain "revelations" materially depressed Uber's valuation, their inclusion in the operative complaint at a minimum magnifies Plaintiff's general failure to tie particular

> misrepresentations to a decline in Uber's value. Plaintiff continues to plead that an amalgam of misrepresentations decreased Uber's value over time, and yet Plaintiff's pleaded facts demonstrate that at least several of those had little or no effect.

Irving does not dispute the district court's description of the chart, but instead provides three arguments arrayed against the district court's conclusion.

First, Irving contends that the district court impermissibly required an immediate market-price reaction to disclosed information. Irving is correct that we have not adopted a "bright-line rule requiring an immediate market reaction." *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1057. Nor do we require an immediate drop in valuation here. Rather, our concern is with the lack of consistency among the valuation reactions that the chart reveals. If the purported revelations—"as opposed to some other fact"— really caused the drops, the funds would have been expected to price the stock consistently downward in response to each revelation, rather than subsequently decreasing, maintaining, or even increasing their valuations. *See Lloyd*, 811 F.3d at 1210. These disparate reactions of multiple funds to the serial revelations of scandals indicate that the funds, in making their decisions on reevaluation of their holdings of Uber stock shares, were not responding to the specific revelations Irving cites.[5]

---

[5] Furthermore, Irving draws no favorable comparisons to cases in which we have held that loss causation was adequately alleged despite a delayed market reaction. Unlike in those cases, Irving did not provide a plausible explanation for a delay in the devaluation of some funds' holdings of Uber stock. *See In re Gilead Scis. Sec. Litig.*, 536 F.3d at

Irving contends that, instead of focusing on the immediate result of the early 2017 revelations, the district court should have considered the "*overall* 30% devaluation saturating that entire year, which was uniformly attributed by market observers to the concealed misconduct lying at the heart of this case." At this stage of the proceedings, we do not dispute Irving's allegation that Uber's apparent valuation decreased over the course of the year. But the issue before us more precisely centers on Irving's failure to plead with particularity and distinguish among the various misstatements and revelations that allegedly *caused* that decrease. Irving's allegations of a general decline in valuation in response to multiple alleged scandals do nothing to alleviate this problem. For we think that the general considerations potentially impacting a stock's valuation will turn on a large range of uncertainties that could impact future earnings and investor valuations, including "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *See Dura Pharms., Inc.*, 544 U.S. at 343.

The value of stocks turns not only on the net value of assets of a company, but also on its earnings. We hesitate to try to summarize the diverse factors that can affect the price at which a willing buyer and seller will get together on a

---

1053–54, 1057–58 (concluding that although the public misunderstood the significance of an FDA warning letter, prices dropped immediately when lower sales resulting from the warning were later revealed); *see also No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) (concluding that loss causation was plausibly alleged "although [the plaintiff's] disclosures of the settlement agreement had no immediate effect on the market price, [because] its stock price dropped 31% on September 3, 1998 when the full economic effects of the settlement agreement and the ongoing maintenance problems were finally disclosed to the market").

completed sale of securities. But these factors rather obviously must include not only any current scandals or problems for management, but also the prospect of future earnings for a company with anticipated growth of earnings, and such things as what is an appropriate multiple of earnings that the market will pay for this type of stock, whether buyers are willing to pay a premium for companies within certain sectors of the economy that are considered hot at any given time, what political or natural events predictably may occur, the general mood of the stock market, whether irrational exuberance for or undue pessimism about the market exists at any particular time, whether investors think the general market or a particular stock is in a pendulum swing one way or the other, and whether a company is valued as a growth stock or as a value stock. *See generally* Benjamin Graham, *The Intelligent Investor: The Definitive Book on Value Investing* (rev. ed. 2003) (thoughtfully discussing many market conditions that may affect price); *see also Dura Pharms., Inc.*, 544 U.S. at 343.

Second, Irving contends that a different analysis should apply because Uber's Offerings' shares were privately traded rather than publicly listed securities. But the private nature of the transactions does not excuse Irving from pleading loss causation.

When a case concerns shares of a privately held company, "a comparison of market stock price to establish loss causation has less relevance because market forces will less directly affect the sales prices of shares of a privately held company." *Nuveen*, 730 F.3d at 1120 (citation omitted). Even in a privately traded securities case, however, "fundamentally the same loss causation analysis occurs." *Id.* at 1123 (cleaned up). A plaintiff is not relieved of the burden of showing "the necessary link between the claimed misrepresentations and the economic loss [she]

suffered." *Id.* at 1116.   Indeed, the Seventh Circuit has concluded that showing loss causation for privately traded securities requires plaintiffs to "carry the *greater* burden of proving the causal links that an efficient secondary market establishes automatically." *Eckstein v. Balcor Film Inv'rs*, 8 F.3d 1121, 1130 (7th Cir. 1993) (emphasis added).

Irving acknowledges that Uber's valuation, even if privately traded, was monitored by major investors.  Irving provided the valuations of these investors as "Market Evidence of Declining Value Due to Revelations of the True State of Uber's Business," concluding that "in the absence of [a] daily trading market, investor valuations provide reliable indicators of security's worth."   Under Irving's theory, then, these revelations should have had an impact reflected in the next round of publicly reported portfolio valuations issued by each mutual fund.  Yet Irving's own chart demonstrates that this did not happen.

Finally, Irving contends that it was not required to plead a "revelation-of-the-fraud theory."  We have expressed that "loss causation is a 'context-dependent' inquiry" and that a tort may cause a loss in an "infinite variety" of ways. *Lloyd*, 811 F.3d at 1210 (citations omitted).   However, "[w]hen plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018).

Irving acknowledges that the SAC pleads a "revelation-of-the-fraud theory" but contends that it should be allowed to plead in the alternative.   But Irving identifies its alternative theory as "the truism" that, under California law, losses may arise the moment investors purchase inflated

securities.  We have already rejected that contention.  *See supra* Section III.B.

## IV

Irving did not plausibly allege that Uber and Kalanick's alleged misstatements caused its damages.  Accordingly, we do not reach the other elements of Irving's claim or the other arguments advanced by the parties.

**AFFIRMED.**